IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BORDER AREA MENTAL HEALTH, INC.,
COUNSELING ASSOCIATES, INC., EASTER
SEALS EL MIRADOR, FAMILIES & YOUTH, INC.,
HOGARES, INC., SOUTHWEST COUNSELING
CENTER, INC., SOUTHERN NEW MEXICO
HUMAN DEVELOPMENT, INC., TEAMBUILDERS
COUNSELING SERVICES, INC., THE
COUNSELING CENTER, INC., and VALENCIA
COUNSELING, INC.,

       Plaintiffs,

v.                                                                         CV 16-1213 MV/SCY

UNITED BEHAVIORAL HEALTH, INC. and
UNITED HEALTHCARE INSURANCE COMPANY,
INC., d/b/a OPTUMHEALTH NEW MEXICO,
PUBLIC CONSULTING GROUP, INC., ELIZABETH
A. MARTIN, ANDREW SEKEL, TIMOTHY S.
MILLER, and JOHN DOES 1-10,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on the Motion to Dismiss All Claims Against It filed by defendant Public Consulting Group, Inc. ("PCG"). [Doc. 7]. The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be granted.

**BACKGROUND**

Defendant United Behavioral Health, Inc. is a foreign corporation that does business on a national basis and is authorized to do business in New Mexico. [Complaint, Doc. 1-1 at ¶ 2]. Defendant United HealthCare Insurance Company, Inc. is a foreign insurance company that does

business on a national basis and is authorized to and is doing business in New Mexico. *Id.* at ¶ 3. Defendants United Behavioral Health, Inc. and United HealthCare Insurance Company, Inc. conducted business in New Mexico through a "d/b/a/," Defendant Optum Health New Mexico ("OHNM") (collectively "United"). *Id.* at ¶ 4.

In 2009, United entered into a "Statewide Contract" with the New Mexico Human Services Department ("HSD") and its 16-member Inter-Agency Behavioral Health Purchasing Collaborative ("Collaborative") to act as New Mexico's "Statewide Entity" to establish, operate, manage, and pay for delivery of behavioral health and substance abuse services to children, families and adults enrolled through the Collaborative's various programs. *Id.* at ¶ 12. Pursuant to the Statewide Contract, from July 1, 2009, through June 30, 2013, United was to serve as the "Statewide Entity" to administer the delivery of behavioral health services to individuals enrolled in and eligible to receive services under the Collaborative's agency programs. *Id*. at ¶ 14. In turn, United, in its capacity as the Statewide Entity, entered into contracts with numerous healthcare providers, including Plaintiffs, to provide the necessary behavioral health and/or substance abuse health care services to the individual enrollees. *Id*. at ¶ 15.

An express provision of the Statewide Contract obligated United to employ a person to be its dedicated Statement Contract Compliance Officer. *Id.* at ¶ 22. United was prohibited from assigning or delegating this key management function. *Id.* United's designated Compliance Officer responsible for exercising key management functions was indicted on May 28, 2014, for alleged criminal misconduct relating to allegations of falsifying records. *Id.* at ¶ 23. The allegations of the Complaint arise from incidents occurring from 2009 through 2012. *Id.*

Plaintiffs allege that United mismanaged its Statewide Contract and, in order to cover up its mismanagement, accused its healthcare providers, including Plaintiffs, of engaging in

2

institutional fraud. *Id*. at ¶¶ 35, 43. Plaintiffs further allege that in 2012, United knew that HSD's newly-designed behavioral health services delivery model under New Mexico Centennial Care would be the subject of procurement in 2012 and become effective January 1, 2014. *Id.* at ¶ 40. Under the new Centennial Care Model, United would no longer be the Statewide Entity for delivery of all behavioral health and substance abuse services for the Collaborative. *Id.* United wanted new contracts with HSD after its Statewide Contract expired on June 30, 2013. *Id.* Plaintiffs allege that in order to achieve its New Mexico contract and company revenue goals, United needed an exit strategy from its Statewide Contract that would expire June 30, 2013. *Id.* at ¶ 41. As one component of United's strategy, United sought and received, effective September 4, 2012, a six-month extension on its Statewide Contract through December 31, 2013. *Id.* at ¶ 42. Another component of United's strategy was to cover up its defective data and claims processing system and its mismanagement of state and federal money by blaming its subcontracted providers, including Plaintiffs, for billing errors that United characterized as "institutional fraud." *Id.* at ¶ 43.

On or about October 25, 2012, Defendant Elizabeth A. Martin, the Chief Executive Officer of OHNM, made a written proposal to the Collaborative representing that United could solve the made-up "institutional fraud" problem by terminating United's existing contracted "bad actors," including Plaintiffs, and substituting Arizona providers to "assume wholesale management" of New Mexico's behavioral health services. *Id.* at ¶¶ 5, 44.

The written proposal suggested that United "import from a neighboring state accredited provider(s) of greater or equal size fully vetted by the State," and represented that United's Arizona network of behavioral health providers could assume wholesale management to

3

maintain uninterrupted delivery of behavior health and substance abuse services to United's Enrollees in New Mexico. *Id.* at ¶ 47.

Defendant Martin also asked the Collaborative for "legal clarification of who owns the dollars if recovery ensues" over concerns that there was no incentive for United to deal with the made-up "institutional fraud" if United did not get a cut of any recovery. *Id.* at ¶ 45. On May 13, 2013, United, the Collaborative and HSD executed the Professional Services Contract, Contract Amendment No. 15, which provided that United was entitled to receive up to 40% of all state funds recovered from any United subcontracted provider that United accused of fraud. *Id.* at ¶ 46.

The Complaint alleges that in December 2012 and January 2013, United conducted "pre-audit investigations" of several of its subcontracted behavioral health care and substance abuse subcontracted providers and identified what United called "billing errors" by its subcontracted providers, including Plaintiffs. *Id*. at ¶ 36.

Based on United's pre-audit summary, in February 2013, HSD contracted with defendant Public Consulting Group, Inc. ("PCG") to conduct a confidential audit of 15 of United's subcontracted providers, including Plaintiffs, at a cost to New Mexico of $3 million. *Id*. at ¶ 37. These 15 subcontracted providers constituted approximately 87% of the Collaborative's spending for Medicaid and state-funded non-Medicaid behavioral health and substance abuse services. *Id*.

Plaintiffs allege that although the PCG audit was supposed to be confidential between the Collaborative and PCG, United actually participated "in partnership" with PCG to audit United's subcontracted providers. *Id.* at ¶ 38.

Based on "information and belief," plaintiffs further allege that:

- United, HSD and PCG "agreed to audit the fifteen providers, including Plaintiffs, with the pre-determined outcome that HSD would make a determination that there were 'credible allegations of fraud' against each of fifteen providers pursuant to 42 C.F.R. § 455.23, which would trigger immediate suspensions of all pending State payments for behavioral healthcare services already rendered and billed by each provider, including Medicaid, CYFD and Department of Corrections payments. *Id.* at ¶¶ 52-53.

- Defendants knew that suspending payments to the 15 audited providers, including Plaintiffs, under 42 C.F.R. § 455.23 would result in HSD referring the providers to the New Mexico Medicaid Fraud Unit ("MFCU"), which would investigate and cause the suspensions to last indefinitely, thus interfering with the providers' contractual and business relationships with HSD and other state agencies and impair or destroy Plaintiff's ability to continue to operate. *Id*. at ¶54.

- United, HSD and PCG agreed that PCG would violate standard auditing practices, including but not limited to refusing to allow the audited providers to respond to initial audit findings and provide explanations and further documentation to address initial findings, in order for the PCG audit to support United, HSD and PCG's pre-determined outcome that there were 'credible allegations of fraud' against the providers, including Plaintiffs." *Id*. at ¶ 55.

Plaintiffs allege that United, HSD and PCG developed a scorecard for each provider, rating them between 1 ("Compliant") and 4 ("Significant Non-Compliance"), then used scorecards to categorize the providers in Risk Tiers from 1 through 4 in the PCG Audit as follows:

1. "Findings that include missing documents, etc.," for which PCG recommended, "Provide training and clinical assistance as needed."

2. "Significant volume of findings that include missing documents" for which PCG recommended "Provide trainings and clinical assistance as needed" and "Potentially embed clinical management to improve processes."

3. "Significant findings, including significant quality of care findings" for which PCG recommended "Provider training and clinical assistance as needed," 'Potentially imbed clinical management to improve processes," and "Potential change in management."

4. "Credible Allegations of Fraud" for which PCG recommended "Mandatory change in management."

5

*Id*. at ¶ 56.

The "confidential" final audit report, dated June 21, 2013, found, *inter alia*, the following:

a. United overpaid fifteen of its subcontracted providers approximately $37.3 million over the period of July 2009 – January 2013. United's overpayment amounted to approximately 15% of the money New Mexico annually paid to United. *Id*.

b. United's claims processing system was not capable of timely and properly adjudicating provider claims. United's promise to use "best practices" in encounter and claims processing in compliance with federal and state statutory and regulatory schemes was not implemented. *Id*. at ¶ 38.

Plaintiffs allege that PCG ranked none of Plaintiffs higher than a 3. *Id*. at ¶ 57. Although PCG determined that all fifteen of the audited providers failed the audit, it nonetheless concluded that: "PCG's Case File Audit did not uncover what it would consider to be credible allegations of fraud, nor any significant concerns related to consumer safety." *Id*. at ¶ 58.[1]

The Complaint alleges that three days later, on June 24, 2013, it was publically announced that HSD received "credible allegations of fraud" concerning 15 of United's contracted non-profit providers of behavioral health services, including Plaintiffs, "which HSD spun as the providers having actually defrauded the Medicaid program out of $36 million over a

---

[1] Plaintiffs allege that United and HSD directed PCG to remove this sentence from the final report, which was released to the public by the New Mexico Attorney General on January 29, 2015. *Id*. at ¶ 59. United and HSD's directive to PCG to remove the above-quoted sentence from the PCG Audit was discovered later during the New Mexico State Auditor's review of the PCG Audit, when the State Auditor had to resort to subpoenaing the PCG Audit from HSD in the First Judicial District Court and HSD produced a different version of the PCG Audit to the State Auditor than the version HSD provided to the Medicare Fraud Control Unit ("MFCU") with referral of the 15 providers in June 2013. *Id*. at ¶ 60.

6

three-year period." *Id*. at ¶ 39. The allegations affected 40% of United's Enrollees, and involved 87% of the money spent through the Collaborative by United. *Id*.

On June 24, 2013, HSD officials met with all 15 behavioral healthcare providers, including Plaintiffs, and notified them that HSD was going to suspend payments to all 15 providers immediately based upon a "credible allegation of fraud" pursuant to 42 C.F.R. § 455.23(a)(1). *Id*. at ¶ 61. HSD suspended in excess of $11,500,000 in payments due and owing to Plaintiffs for services rendered to United Enrollees. *Id*. at ¶ 62. HSD's June 24, 2013, suspension letters to each provider stated that the suspension of payments was "temporary" and would be in effect until (1) prosecuting authorities determined there was insufficient evidence of fraud or alleged fraud or willful misrepresentation by the provider, (2) legal proceedings related to the provider's alleged fraud or willful misrepresentation were completed, or (3) the provider applied for, and received, a "good cause" release of suspended payments pursuant to 42 C.F.R. § 455.23(c). *Id*. at ¶ 63.

Plaintiffs submitted timely "good cause" requests for release of the suspended payments, which HSD denied. *Id*. at ¶¶ 64-65.

MFCU concluded its investigations of Plaintiffs Easter Seals El Mirador and The Counseling Center, Inc. in 2014; Plaintiffs Border Area Mental Health, Inc., Counseling Associates, Inc., Families & Youth, Inc., Hogares, Inc., Southwest Counseling Center, Inc., Southern New Mexico Human Development, Inc., and Valencia Counseling, Inc., on February 8, 2016; and TeamBuilders Counseling Associates, Inc., on April 5, 2016. *Id*. at ¶ 66. MFCU made no finding of fraud or wrongdoing against any of Plaintiffs. *Id*.

As a result, Plaintiffs allege they are owed payments totaling $11.5 million. *Id*. at ¶ 62.

On June 23, 2016, Plaintiffs filed suit in the First Judicial District Court of New Mexico, Santa Fe County, against United Behavioral Health and United Healthcare Insurance Company, doing business as OHNM, Elizabeth Martin, Chief Executive Officer of OHNM, Andrew Sekel, Chief Executive Officer of OptumHealth Behavioral Solutions, and Timothy S. Miller, regional manager for OHNM, collectively referred to as the "United Defendants," in addition to the PCG, the entity that was hired to conduct the audits of Plaintiffs. [Doc. 1-1]. On November 3, 2016, the United Defendants removed the action to this Court. [Doc. 1].

In their Complaint, Plaintiffs allege claims against PCG for (1) tortious interference with contractual relations, (2) prima facie tort, (3) civil conspiracy, and (4) violations of the New Mexico Unfair Practices Act. [Doc. 1-1]. PCG moved to dismiss all four claims. [Doc. 8].

On July 18, 2017, the Court entered a Stipulated Order granting in part PCG's Motion to Dismiss and dismissing with prejudice Plaintiffs' Unfair Practices Act claim against PCG. [Doc. 44].[2] Accordingly, the Court addresses only the first three claims.

## LEGAL STANDARD

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a Rule 12(b)(6) motion, the Court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the

---

[2] On July 21, 2017, plaintiff Teambuilders Counseling Services, Inc. filed a Notice of Dismissal pursuant to Fed. R. Civ. P. 41(a), dismissing with prejudice Counts I, II and III against PCG. [Doc. 45].

8

plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 #22 (2007); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570; *Mink v. Knox* 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims. *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). The Tenth Circuit has explained,

> "[p]lausibility" in this context must refer to the scope of the allegations in a complaint: If they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

PCG contends Plaintiffs' remaining claims should be dismissed because (1) the Complaint fails to state a claim against PCG for intentional interference with contractual relations; (2) Plaintiffs' prima facie tort claim fails to allege that PCG acted lawfully and with specific intent to harm Plaintiffs; and (3) Plaintiffs' claim for civil conspiracy is not actionable.

### (1) Intentional Interference with Contractual Relations

In order to state a claim for intentional interference with existing contracts, a plaintiff must allege:

(1) Defendant had knowledge of the contract between plaintiff and any third party;

(2) Plaintiff was unable to fulfill its contract obligations;

(3) Defendant played an active and substantial part in causing Plaintiff to lose the benefits of the contract;

(4) Plaintiff suffered damages resulting from the breach; and

(5) Defendant induced the breach without justification or privilege to do so.

*Deflon v. Sawyers*, 137 P.3d 577, 643 (N.M. 2006) (citing *Ettenson v. Burke*, 17 P.3d 440, 446 (N.M. Ct. App. 2001)). "In New Mexico, it is not easy for a plaintiff to succeed on a tortious-interference-with-contract claim." *Carreon v. Goodtimes Wood Products, Inc.*, 2011 WL 9686895, at * 2 (D.N.M. Mar. 22, 2011).

PCG contends the well-pled facts of the Complaint (a) fail to establish the existence of a contract between Plaintiffs and HSD; (b) fail to plausibly state that PCG caused, induced or persuaded HSD's determination; and (c) fail to state that PCG acted with improper motive and without justification or privilege.

#### a. Existence of a Contract Between Plaintiffs and HSD

The Complaint alleges that Plaintiffs provided behavioral healthcare services to New Mexico Medicaid beneficiaries through contracts with the New Mexico HSD and other state agencies. [Doc. 1-1, ¶ 5]. However, the Court is unable to infer the existence of any valid and enforceable contracts from this vague reference. *See Burnett v. Mortg. Elect. Registration Sys., Inc.*, 706 F.3d 1231, 1241 ("Legal conclusions can provide the framework of a complaint, [but] they must be supported with factual allegations.") (citing *Iqbal,* 556 U.S. at 679) (finding a complaint insufficient if it tenders "naked assertion[s]" devoid of "further factual enhancement"). Additionally, elsewhere in the Complaint, Plaintiffs allege that they provided behavioral healthcare services pursuant to subcontracts they entered into with United, rather than with HSD or other state agencies, and that they were paid for their services by United, not HSD. [Doc. 1-1, ¶¶ 12, 15, 32, 36, 43].[3] Accordingly, the Court concludes that the well-pleaded allegations of the Complaint do not support their claim of contracts between them and HSD or any other state agency. While it appears this defect could be remedied in an amended complaint, the remaining deficiencies in Count I of the Complaint, as described below, do not appear to be capable of remediation.

#### b. Allegations That PCG Caused, Induced or Persuaded HSD's Determination

The New Mexico Supreme Court has stated:

> A necessary element of the tort of inducing a breach of contract is a showing that the defendant played an active and substantial part in causing the plaintiff to lose the benefits of his contract. *There must be some voluntary conduct on the part of the defendant, some overt act which influences the promisor to breach his contract.*

*Wolf v. Perry*, 339 P.3d 679, 682 (N.M. 1959) (citations omitted) (emphasis added).

---

[3] In their Response to PCG's Motion to Dismiss, Plaintiffs contend they provided behavioral health services to New Mexico Medicaid recipients through Medical Assistance Division 335 Participating Provider Agreements with HSD. [Doc. 31 at 4].

The Complaint alleges that:

- Even when United learned of suspected provider billing errors in 2012, United did not notify its subcontracted providers of these suspected billing errors or inform the Collaborative that it had detected what United later called "credible allegations of fraud or abuse." **Only after United made a business decision to use its fraud and abuse allegations as a source of more revenue did United reveal the alleged fraud and abuse allegations to the Collaborative in September 2012.** Doc. 1-1 at ¶ 35 (emphasis added).

- In December 2012 and January 2013, United conducted "pre-audit investigations" of several of its subcontracted behavioral health care and substance abuse subcontracted providers and identified what United called "billing errors" by its subcontracted providers, including Plaintiffs. *Id.* at ¶ 36.

- Based on United's "pre-audit summary," **in February 2013**, HSD contracted with Public Consulting Group, Inc. ("PCG") to conduct a confidential audit of 15 of United's subcontracted providers, including plaintiffs . . . *Id.* at ¶ 37.

- Upon information and belief, United, HSD, and PCG agreed to audit the fifteen providers, including Plaintiffs, with the pre-determined outcome that HSD would make a determination that there were "credible allegations of fraud" against each of the fifteen providers pursuant to 42 C.F.R. § 455.23. Doc. 1-1, ¶ 52.

- Upon information and belief, United, HSD, and PCG agreed that PCG would violate standard auditing practices, including but not limited to refusing to allow the audited providers to respond to initial audit findings and provide explanations and further documentation to address initial findings, in order for the PCG audit to support United, HSD, and PCG's pre-determined outcome that there were "credible allegations of fraud" against the providers, including Plaintiffs. *Id.* ¶ 55.

- Defendants played an active and substantial part in causing HSD to suspend the payments to Plaintiffs. *Id.* at ¶ 69.

- Upon information and belief, Defendants acted with an improper motive to destroy Plaintiffs' businesses and other improper motives yet to be discovered. *Id.* at ¶ 71.

- Upon information and belief, Defendants used improper means including but not limited to fabricating allegations of Medicaid fraud against Plaintiffs and violating standard auditing practices to support Defendants' pre-determined outcome that HSD would make a finding of "credible allegations of fraud" against Plaintiffs, suspend payments due and owing to them, and refer them to MFCU for investigation. *Id.* at ¶ 72.

Importantly, the allegations in paragraphs ¶¶ 35 and 37 of the Complaint—taken as true—establish that HSD had already decided what its determination would be well before PCG was hired in February 2013 to conduct an audit. Taking these well-pleaded factual allegations as true, Plaintiffs could not prevail on a claim for intentional interference with contractual relations, because "[t]here must be some voluntary conduct on the part of the defendant, some overt act which *influences the promisor to breach his contract*." *Wolf*, 339 P.3d at 682 (emphasis added). According to the Complaint, HSD had already decided it was going to terminate the agreements before PCG was retained.

Further, the allegations in paragraphs 55 and 72—that PCG agreed in advance that it would find credible allegations of fraud against Plaintiffs—are contradicted by the following factual allegations in the Complaint:

- Although PCG determined that all fifteen of the audited providers failed the audit, it nonetheless concluded that: "PCG's Case File Audit did not uncover what it would consider to be credible allegations of fraud, nor any significant concerns related to consumer safety." Doc. 1-1 at ¶ 58.

- United and HSD directed PCG to remove the above-quoted sentence from the report, which was released to the public on January 29, 2015, by the New Mexico Attorney General, and is available at http://www.nmag.gov/home/2013-behavioral-health-audit. *Id.* at ¶ 59.

These paragraphs establish that, contrary to the allegations in paragraphs 55 and 72 of the Complaint, PCG's audit concluded there were no credible allegations of fraud or any significant concerns related to safety, and that HSD—not PCG—ordered these conclusions removed from the report when it was released to the public. Accordingly, the Court finds that the Complaint fails to allege "some overt act which influence[d] the promisor to breach [its] contract." *Wolf*, *supra.*

**c. Allegation that PCG Acted with Improper Motive and without Justification**

PCG argues that Plaintiffs have failed to allege any facts supporting the fifth element of a claim for intentional interference with contractual relations—that PCG induced the breach without privilege or justification. The New Mexico Supreme Court has stated:

> For a defendant's conduct to be without privilege or justification, a plaintiff must demonstrate that the defendant acted with either an improper motive or improper means, and the improper means must be used in persuading the person to breach the contract, but the improper motive need not be the sole motive. If the defendant interfered in some way with the plaintiff's contract, the inquiry, in the end, should be to determine the defendant's primary motivation for the interference. If it was primarily improper, then the defendant has no privilege. If it was primarily proper, then liability should not attach.

*Martin v. Franklin Capital Corp.*, 195 P.3d 24, 27 (N.M. 2008) (citations and quotation marks omitted). The Complaint alleges that, "Upon information and belief, Defendants acted with an improper motive to destroy Plaintiffs' businesses and other improper motives yet to be discovered." [Doc. 1-1, ¶ 72]. However, the Complaint pleads no factual basis for this allegation, nor does it contain any factual allegations that shed light on the issue of what would motivate PCG—a third-party out-of-state consulting firm—to destroy Plaintiffs' businesses.

Similarly, the Complaint states that PCG and other Defendants "used improper means including but not limited to fabricating allegations of Medicaid fraud against Plaintiffs and violating standard auditing practices to support Defendants' pre-determined outcome that HSD would make a finding of 'credible allegations of fraud' against Plaintiffs, suspend payments due and owing to them, and refer them to MFCU for investigation." *Id.* at ¶ 72. However, this statement is contradicted by paragraph 58 of the Complaint, which alleges that "PCG's Case File Audit did not uncover what it would consider to be credible allegations of fraud, nor any significant concerns related to consumer safety." *Id.* at ¶ 58. Because the Complaint fails to set

14

forth sufficient facts to state a plausible claim for intentional interference with existing contracts, PCG's Motion to Dismiss this claim must be granted.

## 2. Prima Facie Tort Claim

In order to state a claim for prima facie tort, Plaintiffs must allege: 1) an intentional and *lawful* act; 2) an intent to injure the plaintiff; 3) injury to the plaintiff as a result of the intentional act; and 4) the absence of justification for the injurious act. *Kitchell v. Public Serv. Co. of New Mexico*, 972 P.2d 344, 348 (N.M. 1998) (emphasis added).

The Complaint fails to allege that the prima facie tort claim arises from, or is based on *lawful* conduct by PCG. [Doc. 1-1 ¶¶ 75-80]. To the contrary, in asserting their claims for tortious interference with contractual relations and civil conspiracy, Plaintiffs allege PCG acted *unlawfully*. *Id.* Plaintiffs' prima facie tort claim is based on the same conduct alleged in the other claims. Accepting as true Plaintiffs' allegations that PCG acted *unlawfully*, then they cannot allege the same conduct was *lawful* in their prima facie tort claim. *See Hill v. Cray Research, Inc.*, 864 F. Supp. 1070, 1078 (D. N.M. 1991) (holding that if defendants' termination of plaintiff's employment was in breach of an implied contract or a tortious wrongful discharge, and thereby in either instance unlawful, the first element of the prima facie tort claim—lawful conduct—could not be met).

Additionally, to plead a viable claim for prima facie tort, Plaintiffs must allege that PCG acted intentionally with a specific intent to injure them. *Schmitz v. Smentowski*, 785 P.2d 726, 737 (N.M. 1990) (holding that prima facie tort "requires that the defendant not only intend the act, but that he also intend the harm."). *See also Saylor v. Valles*, 63 P.3d 1152, 1159 (N.M. Ct. App. 2002) ("Plaintiffs bear a heavy burden of proving actual intent to injure, an intent that is quite distinct from an intent to commit an act that naturally and foreseeably results in injury.").

The Complaint is devoid of any allegations that PCG acted with a specific intent to injure Plaintiffs.

Plaintiffs have not satisfied the pleading requirement for the prima facie tort claim, and, in light of the factual statements they make in their claims for intentional interference with contract and civil conspiracy—*i.e.* that PCG acted *unlawfully*—they cannot state a claim for prima facie tort. Therefore, the claim must be dismissed.

### 3. Civil Conspiracy Claim

Plaintiffs allege Defendants "conspired with HSD and the Collaborative to interfere with Plaintiffs' contractual relationships with HSD and other state agencies and to commit prima facie tort," and are therefore "jointly and severally liable for each other's, HSD's and the Collaborative's wrongful conduct in interfering with Plaintiff's contractual relationships with HSD and other State agencies and prima facie tort." Doc. 1-1 at ¶¶ 81-82. They claim entitlement to actual and punitive damages. *Id.* at ¶¶ 83-84. PCG seeks dismissal of the conspiracy claim.

> To establish a defendant's liability for a civil conspiracy, plaintiffs must allege and prove:
>
> (1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts. However, unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators. A civil conspiracy must actually involve an independent unlawful act that causes harm—*something that would give rise to a civil action of its own*.

*Ettenson v. Burke*, 17 P.3d 440, 445 (N.M. Ct. App. 2000) (citations omitted) (emphasis added). PCG argues that since Plaintiffs' claims for tortious interference with contract and prima facie tort are subject to dismissal, the civil conspiracy, too, must be dismissed. The Court agrees. The Court's determination herein that the Complaint fails to state a viable claim against PCG for

either tortious interference with contract or prima facie tort leaves Plaintiffs with no viable claim against PCG that would "give rise to a civil action of its own." *Id.* Accordingly, the civil conspiracy claim against PCG must also be dismissed.

## CONCLUSION

As set forth above, the well-pleaded facts of the Complaint, taken as true, do not establish any basis for Plaintiffs' claims for intentional interference with contractual relations, prima facie tort or civil conspiracy. Accordingly, the Instant Complaint must be dismissed in its entirety.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss [Doc. 7] is **GRANTED**.

DATED this 2nd day of August, 2018.

_____
MARTHA VAZQUEZ
United States District Judge